FRED MEYER, *alias* FRANK MEYER, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

En Banc.

Opinion Filed March 17, 1925.

Petition for Rehearing denied April 25, 1925.

1. Where an indictment alleges that the defendant unlawfully and from a premeditated design to effect the death of John H. Lane, did assault said John H. Lane and did unlawfully, and from a premeditated design to effect the death of said John H. Lane, shoot at said *Charles* H. Lane, thereby striking said John H. Lane, inflicting on said John H. Lane a mortal wound of which said John H. Lane died, &c., it sufficiently charges the murder of John H. Lane by the defendant.

2. Where even if a proper predicate is not laid for a confession, the statements of the accused testified to could not in view of the defendant's own testimony and other circumstances in evidence have been harmful to the defendant, the admission of testimony as to such statements made by the accused is not reversible error.

3. Where there is ample legal evidence to sustain a finding of premeditated design to kill and killing as alleged, and no prejudicial errors of procedure appear, a verdict and judgment of murder in the first degree will be affirmed.

A Writ of Error to the Circuit Court for Hillsborough County; F. M. Robles, Judge.

Affirmed.

*O. P. Hilburn* and *W. L. Penckes,* for Plaintiff in Error;

*Rivers Buford,* Attorney General, and *J. B. Gaines,* Assistant Attorney General, and *Charles B. Parkhill,* State Attorney, for the State.

WHITFIELD, J.—This writ of error was taken to a judgment imposing a death sentence upon a verdict of murder in the first degree.

The accused testified that the deceased was killed at night by the discharge of a pistol in the hand of deceased while the defendant was scuffling with the deceased, who had assaulted the accused at the solitary home of the deceased where the defendant was visiting him. The body of the deceased was rudely buried by the accused, and property belonging to the deceased was found in the possession of the accused when he was arrested the next day in a nearby city.

The indictment charges that the defendant "did unlawfully and from a premeditated design to effect the death of one John H. Lane make an assault on the said John H. Lane, and a certain pistol, which then and there was loaded with gun powder and leaden bullets and by him the said Fred Meyer, alias Frank Meyer, had and held in his hand, he, the said Fred Meyer, alias Frank Meyer, did then and there unlawfully and from a premeditated design to effect the death of the said John H. Lane shoot off and discharge at and upon the said Charles H. Lane, thereby and by thus striking the said John H. Lane with the said leaden bullets inflicting on and in the body of the said John H. Lane one

mortal wound, of which said mortal wound the said John H. Lane then and there died."

As the indictment distinctly charges that the defendant from a premeditated design to effect the death of John H. Lane assaulted John H. Lane with a loaded pistol and by striking the said John H. Lane with the bullets, inflicting on John H. Lane a mortal wound of which John H. Lane died, the allegation in the indictment that the defendant "did shoot off and discharge (the pistol) at and upon the said *Charles* H. Lane" is not fatal to the indictment. It is clear from the indictment that John H. Lane was the person assaulted with the pistol and that John H. Lane was killed by the discharge of the pistol. See Pittman v. State, 25 Fla. 648, 6 South. Rep. 437; Morris v. State, 54 Fla. 80, 45 South. Rep. 456. See also 29 C. J. 1109; Brown v. State, 84 Fla. 660, 94 South. Rep. 874; Hall v. State, 70 Fla. 48, 69 South. Rep. 692. The defendant could not have been misled by the charge as made, and there was certainly no material or harmful variance between the allegations and the proofs.

The sheriff after testifying that he offered no reward or inducement to the accused, stated that he told the accused "anything that you say might be used against you. Tell me the truth. That is all I want." He then testified as to statements made to him by the accused as to the circumstance of the death of John H. Lane. Even if a proper predicate was not laid for testimony of a confession, the statements of the accused testified to by the sheriff, could not in view of the defendant's own testimony and other circumstances in evidence have been harmful to the defendant.

Other matters of procedure complained of, including the statements of the State Attorney in his argument to the jury that were objected to, have been fully considered and no reversible errors are made to appear. There is ample

evidence from which the jury could have inferred a pre-meditated design to kill and the killing of the deceased as alleged. The proceedings violated no rights of the defendant and the verdict and judgment have a sufficient predicate in the evidence and the rules of law applicable thereto.

Affirmed.

WEST, C. J., AND ELLIS AND TERRELL, J. J., concur.

BROWNE, J., dissenting.

The plaintiff in error is under sentence of death for the killing of one John H. Lane.

The defendant admitted the killing and gave his version of it, which, if true, did not warrant his conviction of murder.

There were no eye witnesses to the homicide, and there are no facts or circumstances to disprove or even discredit his testimony with regard to how the killing occurred, and except for the testimony of the sheriff about an alleged confession, and the improper language used by the State Attorney in his argument to the jury, there would probably have been a different verdict.

To destroy the effect of the testimony of the accused with regard to how the homicide occurred, the sheriff's testimony of an alleged confession was admitted over the objection of the defendant. In this alleged confession he gave a different account of how the homicide occurred, to that which he gave when he testified in his own behalf.

The effect of this, was to discredit the defendant's testimony and resulted in his conviction and sentence to death.

In preparing the foundation for the admission of the testimony with regard to the alleged confession, the sheriff was not asked to state the circumstances surrounding the

confession, or what occurred between him and the defendant prior to the confession, but a perfunctory form of interrogations was adopted, which made the examination a farce.

The answers that the sheriff was supposed to give, were framed for him by the State's Attorney. In effect, the words put in his mouth, and the sheriff had only to respond "yes," or nod his head in affirmation.

After asking the witness if any statement was made to him by the defendant about the death of John H. Lane, the State Attorney propounded these questions:

"Q. Before he made that statement to you did you offer him any hope of reward or make any inducements to get him to make that statement to you?" A. I did not.

"Q. Did you warn him in any way before he made the statement to you?"

It appears that the sheriff had two conversations with the defendant while he was in jail. In the first conversation, he says that he did not warn him in any way before the prisoner made the statement to him.

He said "The first conversation I did not. I had two conversations." He was then asked, "Did you warn him at any time?" To which the sheriff replied, "I asked him to state to me the truth."

It took another question, with the desired answer more specifically detailed to get from this witness what was wanted. He was asked: "Did you warn him, did you tell him that anything he said might be used against him?" to which the sheriff replied, "Yes, sir, I told him: 'Anything that you say might be used against you. Tell me the truth. That is all I want.'" It will be noted that in this reply, the sheriff poll-parroted the words of the State Attorney as to what he told the prisoner.

On cross-examination the sheriff testified, "I didn't send for him. I talked to him. He sent for me and wanted to

tell me.  His statement was voluntary because he sent for me.''

The defendant testified that the sheriff called for him three times, and said he "Had the goods" on him.  He says that the sheriff worried him that night; called for him at 10:30 the first time.  The first two times, I told him I had nothing to say, and the third time I made some kind of a statement.''

In the case of Bates v. State, 78 Fla. 672, 84 South. Rep. 373, this court pointed out the impropriety of an examination with regard to an alleged confession, such as was conducted in the case under consideration.

There the question propounded to the witness was: ''Did Henry Bates, the defendant here, voluntarily and freely without any threats from you, or without any inducement held out to him, or any threats from any one, make a statement to you concerning the breaking and entering of the passenger depot here at Bartow?''

With regard to this, the court said: ''We think it well at this point to call attention to he impropriey of this and similar questions where admissions by parties under arrest are sought to be introduced in evidence.  The question of whether an admission is freely and voluntarily made, is for the court to determine and it is not a matter of the opinion of the witness.  The proper method is to have the witness state the circumstances under which they were made so: that the court and not the witness may determine if they were free and voluntary.''

The method pursued in the instant case was more objectionable than that in the Bates case, *supra*, which this court cendemned.

Many years ago, the world's greatest observer of human conduct said: ''What thief boasts of his own attaint?'' Had he been familiar with the records of this court, he would have discovered that not only thieves but murderers

show a remarkable desire to suffer punishment for their crimes, and voluntarily and cheerfully without any promise of benefit and without any threats, and after having been told that anything they said might cause them to dangle at the end of a rope, or be scorched to death in the electric chair, glibly tell of their own attaint.

Alleged confessions should not be admitted, except the proof be clear, positive and plausible, that they are entirely voluntary; not induced by the hope of any favor or from fear of what may result from a failure to confess, and that the defendant was fully warned and fully understood the nature and effect of the warning.

The testimony of the sheriff, independently of the answers suggested by the State Attorney by his questions, as to what he did and what he said to the prisoner, before the alleged confession, entirely fails to show that the alleged confession was a voluntary one, and his testimony with respect thereto should not have been admitted in evidence.

In the course of the direct examination of J. T. Aycock by the State Attorney, in reply to an objection by the defendant to a question with regard to a check, the State Attorney in the presence of the jury said: "We are trying to show a motive for the killing of this man. If we can show by this witness or other witnesses that this man was hard up and that he had given fraudulent checks and that he was going to be arrested."

It is true the court instructed the jury not to pay any attention to the remarks of the State Attorney, but the harm was done and the State Attorney got before the jury, supported by the weight of his high standing and character, that this defendant had given fraudulent checks; for which he was about to be arrested; and that he was "hard up," and that such was the defendant's motive for the kill-

ing. Thus the State Attorney, and not the testimony, furnished the motive for the crime.

After the court stated that he would instruct the jury not to pay any attention to these remarks, the State Attorney asserted his determination to have his say: "I am willing for the jury to be withdrawn or kept in here but I am going to say what I am going to say in support of my questions and then leave it up to the court. I am State Attorney here and I want to put in all of the evidence that is perfectly proper and material. The purpose of this testimony is *to show that this man had given a bad check, that this witness here was after him, trying to get his money; that that was only three or four days before Mr. Lane was killed,* and it would be a question for the jury, as I understand it, and I *may* follow this up *with other instances of the same kind,* to show all of the circumstances, the knowledge that Meyer had of Mr. Lane's premises and all, to show whether or not it was for the *purpose of getting money that he killed Mr. Lane."* (Italics are mine.)

Again the court told the jury not to consider any of the foregoing statement by the State Attorney.

The State Attorney is not only an officer of the court, but a State official,—a part of the machinery in the trial of criminal cases,—and improper conduct on his part, prejudicial to the defendant, should be grounds for reversal.

Other objectionable remarks of the State Attorney prejudicial to the defendant, were these: "but with all his shrewdness, and he has demonstrated here that he has the shrewdness of the criminal from the East Side of New York City."

Notwithstanding the objections to these remarks by the defendant, the court gave them his sanction by replying, "He said he was from New York City." The State Attorney, however, had characterized the defendant as a "criminal" from the East Side of New York City.

The "East Side" of New York furnishes many of the criminal class. The defendant testified that he was from New York City, but did not say he was from the East Side, and the State Attorney was not warranted in referring to him as "a criminal from the East Side of New York City," when there was no testimony to that effect.

The State Attorney also said: "Well, now, gentlemen, I want to say that we scratch sometimes where it itches. It might be this defendant had heard that expression *from some other sheriff who got the goods on him.*" There was no testimony about any other sheriff having "gotten the goods" on the prisoner, and this language was in effect a declaration by the State Attorney that the prisoner had been under arrest before, and that some other sheriff had "got the goods on him."

Where a State Attorney indulges in such language, and where testimony of alleged confessions are admitted without a proper predicate, and where the word of the sheriff who is interested in securing a conviction, and the word of the prisoner who is interested in securing his acquittal are in conflict, and where the essentials to establish that a confession was voluntary are not established, and where the testimony of a confession adduced by questions that contain all the essential elements of the testimony, to which the witness has merely to reply "yes," or "I did," such an alleged confession is far from voluntary, and should not be admitted in evidence.

Homicides in the United States far exceed those in any other country in the world, and evince a disregard of the value of human life.

The courts can assist materially in creating a public sentiment that will hold human life to be precious, but they can not do so by sending a man to his death, when any of the essential elements of a fair and impartial trial have

been violated, as seems to me, from the record to have been done in this case.

I think the judgment should be reversed.